## STATE OF CONNECTICUT *v.* DAVID E. LEE
## (AC 31817)

Gruendel, Beach and Bear, Js.

Argued May 21—officially released October 9, 2012

*Annacarina Jacob*, senior assistant public defender, for the appellant (defendant).

*Sarah Hanna*, assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Charles W. C. Johnson*, assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, David E. Lee, appeals from the judgments of conviction, rendered after a jury trial, of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of General Statutes (Rev. to 2005) § 14-227a (a) (1) and (2), operation of a motor vehicle while his license was under suspension in violation of General Statutes § 14-215 (c), conspiracy to make a false statement in the second degree in violation of General Statutes §§ 53a-48 and 53a-157b (a), conspiracy to fabricate physical evidence in violation of General Statutes §§ 53a-48 and 53a-155 (a) (2), and tampering with a witness in violation of General Statutes § 53a-151. On appeal, the defendant claims that (1) the court erred in admitting the results of his blood alcohol test without requiring any authentication or foundation for the document, (2) there was insufficient evidence to support any of his convictions, (3) the court erred in granting his counsel's motion to withdraw, (4) the court erred in convicting him on both conspiracy charges and (5) the court's jury instructions on both conspiracy charges improperly misled the jury on the element of intent. We affirm in part and reverse in part the judgments of the trial court.

The jury reasonably could have found the following facts on the basis of the evidence presented. On September 22, 2005, the defendant, while driving a 1997 Ford Expedition on Reeves Road in Ellington, lost control of the vehicle, causing it to flip over onto its roof in the middle of the roadway after hitting and knocking over a telephone pole and power lines. The vehicle was totaled, and its windows were broken out. Emergency responders arrived at the scene at approximately 3:30 a.m., and they found the defendant unconscious, lying on the interior roof of the flipped over vehicle. After being extricated from the vehicle by fire department personnel, who had to use hand tools because the door handles on the vehicle did not work, the defendant regained consciousness and stated that he did not know what had happened because he must have fallen asleep. Andrea Cloutier, a state police trooper, detected an odor of alcohol emanating from the interior of the vehicle and from the defendant. After walking the area of the scene and using thermal imaging to check for heat sources in the nearby wooded area that would indicate the presence of a person, the emergency responders determined that there were no other possible occupants of the vehicle in the area. The defendant was transported to Hartford Hospital by Life Star helicopter, where, at 4:39 a.m., medical testing revealed, among other things, that he had a blood alcohol content of 0.17.[1] The defendant underwent surgery and remained in the hospital for several weeks while recovering from very serious injuries. The defendant was arrested and charged with operating a motor vehicle while under the influence of intoxicating liquor and operating a motor vehicle while his license was under suspension.

The summer following the accident, the defendant and his friend, Joshua Figella, while working together,

---

[1] Pursuant to § 14-227a (a), a person has an elevated blood alcohol content if such person has "a ratio of alcohol in the blood . . . that is eight-hundredths of one per cent or more of alcohol, by weight."

discussed the accident, and Figella said he would be willing to accept responsibility for the accident. The defendant and Figella came up with a story "about what would need to be said," and the two agreed that Figella would sign an affidavit stating that he was driving the vehicle at the time of the accident, but that he had left after the accident to go find help. Each contacted the defendant's attorney, Robert D. Swartout.[2] Figella and the defendant then met with Swartout, and Figella signed an affidavit attesting that he had been driving the 1997 Ford Expedition when the accident occurred. After reopening her investigation, Cloutier spoke with Figella, who initially affirmed his statements set forth in the affidavit. Subsequently, however, Figella admitted that the affidavit contained false information. Figella later spoke with David Kenary, an inspector from the office of the state's attorney, and provided him with a written statement admitting that the affidavit contained false information. The defendant and Figella were arrested in connection with the false affidavit.

The defendant elected a trial by jury, and, after the close of evidence, the jury found him guilty of two counts of operating under the influence of intoxicating liquor and one count of operation of a motor vehicle while his license was under suspension, conspiracy to make a false statement in the second degree, conspiracy to fabricate physical evidence and tampering with a witness. The defendant then pleaded nolo contendere under a part B information to a charge of being a persistent offender with respect to operating under the influence. The court sentenced him to a total effective term of eight years and thirty days imprisonment, execution suspended after three years and ten months, followed by three years probation. This appeal followed. Additional facts will be set forth as necessary.

[2] Swartout, on May 8, 2006, had filed an appearance only in the defendant's driving under the influence case, MV-06-0354066.

I

The defendant first claims that the court erred in admitting a medical record (document), pursuant to § 14-227a (k), that contained the results of his blood alcohol test without requiring any authentication or foundation for the document and that this violated his right to confrontation. He argues that the document was hearsay and that the court should have required that the state satisfy either the hospital record exception; see General Statutes § 4-104; or the business record exception; see General Statutes § 52-180; to the hearsay rule before admitting the document. He also argues that, before the court could admit the results of the blood alcohol test pursuant to § 14-227a (k), the state had to offer evidence "as to who drew the defendant's blood [and] . . . that the blood sample [was] taken in accordance with the regulations adopted under subsection (d) of § 14-227a."[3] In response to the defendant's claim, the state argues in relevant part that the court properly admitted the document because "§ 14-227a (k) is an exception to the hearsay rule that provides an independent basis for admitting the defendant's blood alcohol test [results] without regard to the business record or the hospital record exceptions to the hearsay rule." The state also argues that, although "the statute originally contained requirements as to who had to conduct the blood test in order for it to be admissible . . . in 1999, the legislature determined that this issue was better addressed by regulations promulgated by

[3] Prior revisions of § 14-227a (k) specified who was qualified to take a blood sample from an injured operator. See, e.g., General Statutes (Rev. to 1995) § 14-227a (*l*) (blood alcohol analysis admissible provided in relevant part that "the blood sample was taken by a person licensed to practice medicine in this state, a resident physician or intern in any hospital in this state, a phlebotomist, a qualified laboratory technician, an emergency medical technician II or a registered nurse").

the [c]ommissioner of [p]ublic [s]afety[4] [(commissioner)]. . . . Thus, the legislature amended the statute to allow for the [commissioner] to adopt regulations he deemed necessary as to testing procedures . . . [and] the [commissioner] adopted Regs., Conn. State Agencies § 14-227a-2b, which specifically exempted any blood samples 'collected and analyzed for other purposes, such as medical diagnostic testing,' from the regulatory requirements." (Citations omitted.) Thus, the state argues, "the [commissioner], having been specifically authorized by the legislature to do so, determined that no specific rules or procedures were necessary for samples collected and analyzed for medical diagnostic testing."[5] We agree with the state.

We apply the following standard of review to the defendant's claim. "To the extent a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary.

---

[4] The commissioner of public safety now is called the commissioner of emergency services and public protection. See Public Acts 2011, No. 11-51, § 134 (a). For convenience, we simply refer to him as the commissioner.

[5] The defendant, in his reply brief, responds that the state "fails to recognize that if . . . its interpretation of the statute is correct, then our legislature has created a statute that unconstitutionally infringes upon a defendant's due process right to a fair trial and to confront witnesses because it allows the admission of evidence that has not been historically recognized as reliable or trustworthy."

"We have consistently held that every statute is presumed to be constitutional . . . . [T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it . . . ." (Citations omitted; internal quotation marks omitted.) *Rayhall* v. *Akim Co.*, 263 Conn. 328, 341, 819 A.2d 803 (2003). "A defendant challenging the constitutionality of a statute bears the heavy burden of establishing the statute's invalidity beyond a reasonable doubt." *State* v. *Carolina*, 40 Conn. App. 762, 766, 673 A.2d 562, cert. denied, 237 Conn. 914, 675 A.2d 886 (1996).

In this case, the defendant failed to raise a constitutional challenge to § 14-227a (k) before the trial court, he has failed to provide a constitutional analysis of § 14-227a (k) in his appellate brief and he has not requested *Golding* review. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Accordingly, we decline to consider the defendant's statement in his reply brief challenging the constitutionality of § 14-227a (k).

For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no 'judgment call' by the trial court, and the trial court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought. . . . Thus . . . the function performed by the trial court in issuing its ruling should dictate the scope of review." (Citations omitted.) *State* v. *Saucier*, 283 Conn. 207, 218–19, 926 A.2d 633 (2007).

"Hearsay means a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the matter asserted. Conn. Code Evid. § 8-1 (3). Hearsay is generally inadmissible unless an exception in the Code of Evidence, the General Statutes or the rules of practice applies. Conn. Code Evid. § 8-2." (Internal quotation marks omitted.) *State* v. *Foster*, 293 Conn. 327, 334, 977 A.2d 199 (2009).

In the present case, we must consider whether the court properly admitted the document into evidence under § 14-227a (k).[6] For such evidence to be admissible

[6] General Statutes § 14-227a (k) provides: "Seizure and admissibility of medical records of injured operator. Notwithstanding the provisions of subsection (b) of this section, evidence respecting the amount of alcohol or drug in the blood or urine of an operator of a motor vehicle involved in an

and competent under this subsection, a trial court must find that the evidence satisfies each of the four conditions set forth in § 14-227a (k): (1) the blood or urine sample must have been provided for the diagnosis and treatment of the injuries sustained by the operator involved in the motor vehicle accident; (2) if a blood sample was taken from the operator, it must have been taken in accordance with the regulations adopted under § 14-227a (d);[7] (3) a police officer must have demonstrated to a judge of the Superior Court that such officer

accident who has suffered or allegedly suffered physical injury in such accident, which evidence is derived from a chemical analysis of a blood sample taken from or a urine sample provided by such person after such accident at the scene of the accident, while en route to a hospital or at a hospital, shall be competent evidence to establish probable cause for the arrest by warrant of such person for a violation of subsection (a) of this section and shall be admissible and competent in any subsequent prosecution thereof if: (1) The blood sample was taken or the urine sample was provided for the diagnosis and treatment of such injury; (2) if a blood sample was taken, the blood sample was taken in accordance with the regulations adopted under subsection (d) of this section; (3) a police officer has demonstrated to the satisfaction of a judge of the Superior Court that such officer has reason to believe that such person was operating a motor vehicle while under the influence of intoxicating liquor or drug or both and that the chemical analysis of such blood or urine sample constitutes evidence of the commission of the offense of operating a motor vehicle while under the influence of intoxicating liquor or drug or both in violation of subsection (a) of this section; and (4) such judge has issued a search warrant in accordance with section 54-33a authorizing the seizure of the chemical analysis of such blood or urine sample. Such search warrant may also authorize the seizure of the medical records prepared by the hospital in connection with the diagnosis or treatment of such injury."

[7] General Statutes § 14-227a (d) provides: "Testing and analysis of blood, breath and urine. The [commissioner] shall ascertain the reliability of each method and type of device offered for chemical testing and analysis purposes of blood, of breath and of urine and certify those methods and types which said commissioner finds suitable for use in testing and analysis of blood, breath and urine, respectively, in this state. The [commissioner] shall adopt regulations, in accordance with chapter 54, governing the conduct of chemical tests, the operation and use of chemical test devices, the training and certification of operators of such devices and the drawing or obtaining of blood, breath or urine samples *as said commissioner finds necessary* to protect the health and safety of persons who submit to chemical tests and to insure reasonable accuracy in testing results. Such regulations shall not

believed that the operator had been operating a motor vehicle while under the influence of intoxicating liquor, drugs or both and that the chemical analysis of the operator's blood or urine constituted evidence of the commission of the offense of operating a motor vehicle while under the influence of intoxicating liquor or drug or both; and (4) that the judge had issued a search warrant for the seizure of the chemical analysis of the operator's blood or urine.

The defendant does not dispute that the blood sample was taken for the diagnosis and treatment of his injuries, that a warrant properly was sought on the basis of an officer's belief that the defendant had been operating a motor vehicle while under the influence of liquor or that a judge properly issued a warrant for the seizure of the chemical analysis of his blood. See General Statutes § 14-227a (k) (1), (3) and (4). Rather, the defendant argues that the second requirement of § 14-227a (k) (2), namely, that the blood sample must have been taken in accordance with the regulations adopted under subsection (d) of § 14-227a, was not met in this case because the commissioner declined to enact regulations to cover instances where blood alcohol testing is done as part of medical diagnosis and treatment. Without contesting the constitutionality of § 14-227a (k),[8] however, he also argues that "[t]he admission of the . . . hospital records containing the blood alcohol level violated the defendant's sixth amendment right to confrontation because by merely satisfying the requirement of [§] 14-227a (k) the state did not establish the reliability of blood alcohol tests." We conclude that the court properly determined that the document met the conditions specified in § 14-227a (k) and, therefore, that it

require recertification of a police officer solely because such officer terminates such officer's employment with the law enforcement agency for which certification was originally issued and commences employment with another such agency." (Emphasis added.)

[8] See footnote 6 of this opinion.

was admissible and competent evidence. See General Statutes § 14-227a (k) (*"evidence* respecting the amount of alcohol . . . in the blood . . . of an operator of a motor vehicle involved in an accident who has suffered . . . physical injury in such accident . . . *shall be admissible and competent* in any subsequent prosecution thereof if [four conditions are met]" [emphasis added]); see also *State* v. *Kirsch,* 263 Conn. 390, 408, 820 A.2d 236 (2003) (testing that complies with regulatory requirements, as promulgated pursuant to commissioner's authority under § 14-227a [d] "is deemed to be competent evidence"); *State* v. *Stern,* 65 Conn. App. 634, 641, 782 A.2d 1275 (testing that complies with commissioner's regulations under § 14-227a [d] "is always admissible if obtained in conformity with [the statutory] requirements" [internal quotation marks omitted]), cert. denied, 258 Conn. 935, 785 A.2d 232 (2001).

Although prior revisions of § 14-227a specified who was qualified to take a blood sample from an injured operator; see, e.g., General Statutes (Rev. to 1995) § 14-227a (*l*) (blood alcohol analysis admissible provided in relevant part that "the blood sample was taken by a person licensed to practice medicine in this state, a resident physician or intern in any hospital in this state, a phlebotomist, a qualified laboratory technician, an emergency medical technician II or a registered nurse"); the legislature, pursuant to Public Acts 1999, No. 99-255, § 1 (c), decided that this issue was better left to the commissioner to regulate, and it required that the blood test be taken "in accordance with the regulations adopted under subsection (e) [now subsection (d)] . . . ." That subsection of § 14-227a gave the commissioner the discretion to adopt regulations "as said commissioner finds necessary to protect the health and safety of persons who submit to chemical tests and to insure reasonable accuracy in testing results." See Public Acts 1999, No. 99-255, § 1 (e).

In accordance with the legislature's directive, the commissioner has adopted §§ 14-227a-1b to 14-227a-10b of the Regulations of Connecticut State Agencies to regulate forensic chemical testing of blood, breath and urine taken from motor vehicle operators. Pursuant to § 14-227a-2b of the regulations, however, "[s]ections 14-227a-1b to 14-227a-10b . . . [of the regulations do] not apply to samples collected and analyzed for other purposes, such as medical diagnostic testing." Therefore, in accordance with the discretion vested in him by the legislature, as codified in § 14-227a (d), permitting the commissioner to adopt regulations as he "finds necessary," the commissioner determined that it is not necessary to adopt regulations for samples collected and analyzed for the purpose of medical diagnostic testing.

Although the defendant argues that the court improperly admitted the document because the commissioner failed to adopt regulations when he was directed to do so, we conclude that the legislature, although directing the commissioner to adopt regulations governing chemical testing of blood and urine, specifically gave the commissioner the discretion to adopt regulations as the commissioner found necessary. Section 14-227a (k) specifically states that evidence of the chemical analysis results is *admissible and competent evidence* provided the conditions set forth within the statute are met. General Statutes § 14-227a (k) ("evidence respecting the amount of alcohol or drug in the blood or urine of an operator of a motor vehicle involved in an accident who has suffered or allegedly suffered physical injury in such accident . . . *shall be admissible and competent* in any subsequent prosecution . . . if [four conditions are met]" [emphasis added]). Accordingly, the defendant has failed to prove that the court improperly admitted the document pursuant to § 14-227a.

II

The defendant next claims that there was insufficient evidence to support any of his convictions. He claims

that the state failed to prove (1) "the element of operation for the charge[s] [under] . . . §§ 14-227a and 14-215 (c)"; (2) that he "attempted to 'induce' a 'witness' to testify falsely for the charge of tampering with a witness"; and (3) that "the defendant knew the falsity of Figella's statement for the crimes of conspiracy to fabricate evidence and conspiracy to make a false statement in the second degree." We are not persuaded.

The defendant concedes that some of his insufficiency of the evidence claims were not preserved at trial. We conclude, nonetheless, that they are entitled to review because "any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)]." (Internal quotation marks omitted.) *State* v. *Rodriguez-Roman*, 297 Conn. 66, 73, 3 A.3d 783 (2010). In *State* v. *Roy*, 233 Conn. 211, 658 A.2d 566 (1995), our Supreme Court explained that a defendant need not invoke the guidelines of *Golding* to be entitled to review of unpreserved insufficiency of the evidence claims because "[i]t is an essential of the due process guaranteed by the [f]ourteenth [a]mendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof . . . ." (Internal quotation marks omitted.) Id., 212–13.

"In reviewing an evidentiary insufficiency claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Rodriguez-Roman*, supra, 297

Conn. 73–74. We consider each of the defendant's claims in turn.

A

The defendant claims that there was insufficient evidence to support his conviction on the charges of operating a motor vehicle while under the influence of intoxicating liquor and operating a motor vehicle while his license was under suspension because the state failed to prove the element of operation of a motor vehicle for each of the charged offenses. We are not persuaded.

"Section 14-215 prohibits any person from operating a motor vehicle in Connecticut if that person's license or operating privileges have been suspended, revoked, or refused for any reason." *State* v. *Cook*, 36 Conn. App. 710, 713, 653 A.2d 829 (1995). "General Statutes § 14-227a (a) provides in relevant part: 'No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both.' . . . Section 14-227a (a) prohibits operating a motor vehicle while under the influence rather than merely driving a motor vehicle while under the influence. It is well settled that 'operating' encompasses a broader range of conduct than does 'driving.'" *State* v. *Haight*, 279 Conn. 546, 551, 903 A.2d 217 (2006).

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Adams*, 225 Conn. 270, 276–77, 623 A.2d 42 (1993). Although the evidence leading to the conclusion that the defendant had been the operator of the motor vehicle may have been circumstantial in this case, it is fundamental that "[t]here

is no distinction between direct and circumstantial evidence [so] far as probative force is concerned . . . . In fact, circumstantial evidence may be more certain, satisfying and persuasive than direct evidence. . . . In a case involving circumstantial evidence, we must examine the cumulative impact of a multitude of factors in order to determine whether the identification of the defendant has been satisfactorily established by the circumstantial evidence. . . . If evidence, whether direct or circumstantial, should convince a jury beyond a reasonable doubt that an accused is guilty, that is all that is required for a conviction." (Citations omitted; internal quotation marks omitted.) *State* v. *Teti*, 50 Conn. App. 34, 39, 716 A.2d 931, cert. denied, 247 Conn. 921, 722 A.2d 812 (1998).

The defendant claims that the state's evidence was insufficient to prove beyond a reasonable doubt that he was the person who operated the vehicle involved in the accident. Although there was no direct evidence that the defendant had been driving the vehicle at the time of the accident, we conclude that the jury reasonably could have inferred this fact on the basis of the circumstantial evidence presented at trial.

The evidence demonstrated that when the emergency responders arrived at the accident scene, the vehicle, which was owned by the defendant's fiancée, was on its roof, with its windows broken out, in the middle of the roadway. The defendant was inside the vehicle, unconscious. There were no signs that another person had been in the vehicle with the defendant, and no other person was found in the area. The vehicle was totaled after hitting and knocking down a nearby telephone pole, had flipped over onto its roof and, in order to extricate the defendant from the vehicle, the emergency responders had to use hand tools to open the vehicle doors because the door handles would not work. We conclude that, on the basis of this evidence,

the jury reasonably could have determined that the defendant had been operating the motor vehicle. Accordingly, "operation" being the only challenged element of the crimes of operating a motor vehicle while under the influence of intoxicating liquor and operating a motor vehicle while his license was under suspension, we conclude that the jury reasonably found the defendant guilty of these crimes beyond a reasonable doubt.

## B

The defendant claims that "[t]he state failed to prove [that] the defendant attempted to 'induce' a 'witness' to testify falsely for the charge of tampering with a witness [pursuant to] § 53a-151." The defendant argues that there was no evidence that he induced, attempted to induce or directly caused Figella to testify falsely. He also argues that Figella could not be considered a witness within the meaning of the statute. We disagree.

Section 53a-151 (a) provides: "A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding." The defendant does not contest the requirement that the state prove that he believed that an official proceeding was pending or was about to be instituted. Rather, he challenges the state's proof that Figella was a witness and that the defendant induced or attempted to induce Figella to testify falsely. The defendant argues that "the evidence before the jury had to be sufficient for it to conclude that the defendant's conduct was intended to *prompt* Figella to testify falsely at [the] defendant's trial." (Emphasis added.) He also argues that the evidence needed to show that he *directly cause[d]*" the false testimony. (Emphasis in original.) Although we agree that the state needed to prove that

the defendant intended to prompt and directly cause Figella to testify falsely, we conclude that the state met its burden of proof in this case.

"The language of § 53a-151 plainly warns potential perpetrators that the statute applies to any conduct that is intended to prompt a witness to testify falsely . . . . The legislature's unqualified use of the word 'induce' clearly informs persons of ordinary intelligence that any conduct, whether it be physical or verbal, can potentially give rise to criminal liability. Although the statute does not expressly mandate that the perpetrator intend to cause the witness to alter or withhold his testimony, this implicit requirement is apparent when the statute is read as a whole. . . . The legislature's choice of the verb 'induce' connotes a volitional component of the crime of tampering that would have been absent had it employed a more neutral verb such as 'cause.' Furthermore, the statute's application to unsuccessful, as well as successful, attempts to induce a witness to render false testimony supports our conclusion that the statute focuses on the mental state of the perpetrator to distinguish culpable conduct from innocent conduct." (Citations omitted.) *State* v. *Cavallo*, 200 Conn. 664, 668–69, 513 A.2d 646 (1986).

We explained in *State* v. *Coleman*, 83 Conn. App. 672, 678–80, 851 A.2d 329, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004), cert. denied, 544 U.S. 1050, 125 S. Ct. 2290, 161 L. Ed. 2d 1091 (2005): "The clear import of [the] language [set forth in *Cavallo*] is that the respective mental states of the [witness], i.e., [his or her] purported willingness to testify falsely, is irrelevant to whether the defendant's conduct falls within the statutory bounds of proscribed conduct. The Supreme Court made clear that liability under § 53a-151 hinges on the mental state of the perpetrator in engaging in the conduct at issue—his intent to induce a witness to testify

falsely—not on whether he must overcome by coercive means the will of a witness reluctant to do so.

"As the result of our Supreme Court's lucid explanation of the type of conduct prohibited under § 53a-151, there exist[s] a judicial gloss with respect to the statute, of which the defendant must be presumed to have been aware, to the effect that the statute can be violated even though a witness may be independently willing to provide false testimony."

Here, although the defendant might be correct that the evidence tended to show that Figella, initially, had approached the defendant with the idea of providing false information as a way to help the defendant, it was the defendant who put Figella in touch with Swartout for the sole purpose of providing a false affidavit for the benefit of the defendant, and the defendant was right next to Figella when Figella signed the false affidavit in the presence of Swartout. Further, Figella testified at the defendant's trial that he and the defendant "had talked about what would need to be said . . . ." Additionally, Figella stated that he had discussed with the defendant that if, as a result of providing a false affidavit, Figella was required to pay for the broken telephone pole, the defendant actually would cover the cost.

"[A] defendant is guilty of tampering with a witness only if he intends that his conduct directly cause a particular witness to testify falsely or to refrain from testifying at all. So interpreted, § 53a-151 warns the public that it applies only to conduct intentionally undertaken to undermine the veracity of the testimony given by a witness." *State* v. *Cavallo*, supra, 200 Conn. 672. On the basis of the evidence presented, we conclude that the jury reasonably could have concluded that the defendant intentionally engaged in conduct meant to undermine the veracity of Figella's testimony.

The defendant also argues, however, that Figella cannot be considered a "witness," as that word is used in § 53a-151. He contends that, pursuant to General Statutes § 53a-146 (6), "[a] witness . . . is any person summoned, or *who may be summoned,* to give testimony in an official proceeding."[9] (Emphasis in original; internal quotation marks omitted.) He argues that Figella knew nothing about the accident, and, therefore, he was not someone who would have been summoned to appear.[10] The state, although agreeing with the definition set forth by the defendant, responds that, once the defendant and Figella began discussing the defendant's case, Figella became someone "who may be summoned" to give testimony in an official proceeding. We agree with the state.

Section 53a-151 (a) provides in relevant part: "A person is guilty of tampering with a witness if, believing that an official proceeding is pending . . . he induces or attempts to induce a witness to testify falsely . . . ." In *Cavallo*, the witness with whom the defendant tampered was a participant in the activities that the defendant sought to cover up. *State* v. *Cavallo*, supra, 200 Conn. 665. Following the defendant's argument, and pursuant to *Cavallo*, such witness was a "person summoned, or *who may be summoned,* to give testimony in an official proceeding." (Emphasis in original; internal quotation marks omitted.) Likewise, in this case, once Figella said he would be willing to accept responsibility for the accident, and the defendant and Figella came

---

[9] "An 'official proceeding' is any proceeding held or which may be held before any legislative, judicial, administrative or other agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner or notary or other person taking evidence in connection with any proceeding." General Statutes § 53a-146 (1).

[10] Although Figella may not have had direct knowledge of the accident, he did have direct knowledge of the conspiracy between the defendant and him, and of the falsity of the affidavit he provided to Swartout for dissemination to Cloutier.

up with a story "about what would need to be said," Figella and the defendant became participants in an attempted cover-up of the defendant's offenses, and Figella became a person likely to be summoned, or "*who may be summoned,* to give testimony in an official proceeding." (Emphasis in original; internal quotation marks omitted.) The defendant's actions thereafter, including his participation in Figella's false affidavit, constituted the offense of tampering with a witness.

C

The defendant also claims that "the state failed to prove the defendant knew the falsity of Figella's statement for the crimes of conspiracy to fabricate evidence and conspiracy to make a false statement in the second degree." He argues that "[i]n order for the jury to reasonably conclude [that] the defendant knew the falsity of . . . Figella's version of [the] car accident, it had to first conclude [that] the defendant knew what had occurred that night . . . [and] [t]he jury in this case had no evidence before it . . . [that] the defendant knew Figella's statement was false." The state responds in relevant part that the facts clearly demonstrate that the defendant knew that Figella's statement, namely, the affidavit, was false. We agree with the state.

Section 53a-48 provides in relevant part: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

Section 53a-157b (a) provides: "A person is guilty of false statement in the second degree when he intentionally makes a false written statement under oath or pursuant to a form bearing notice, authorized by law, to the effect that false statements made therein are punishable, which he does not believe to be true and which

statement is intended to mislead a public servant in the performance of his official function."

Section 53a-155 (a) provides in relevant part: "A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he . . . (2) makes, presents or uses any record, document or thing knowing it to be false and with purpose to mislead a public servant who is or may be engaged in such official proceeding."

In part I of this opinion, we determined that the jury had before it sufficient evidence to have concluded, beyond a reasonable doubt, that the defendant had been operating the vehicle at the time of the accident. We further concluded in part II B of this opinion that "although the defendant might be correct that the evidence tended to show that Figella, initially, had approached the defendant with the idea of providing false information as a way to help the defendant, it was the defendant who put Figella in touch with Swartout for the sole purpose of providing a false affidavit for the benefit of the defendant, and the defendant was right next to Figella when Figella signed the false affidavit in the presence of Swartout. Further, Figella testified at the defendant's trial that he and the defendant 'had talked about what would need to be said . . . .' Additionally, Figella stated that he had discussed with the defendant that if, as a result of providing a false affidavit, Figella was required to pay for the broken telephone pole, the defendant actually would cover the cost." On the basis of this evidence and the reasonable inferences drawn therefrom, we conclude that the jury reasonably could have found, beyond a reasonable doubt, that the defendant was guilty of conspiring with Figella to fabricate evidence and to make a false statement.

## III

The defendant claims that the court erred in granting Swartout's motion to withdraw "in contravention of [the] defendant's right to counsel of choice under the sixth amendment [to the United States constitution]." He argues that, although Swartout filed the motion to withdraw, the court's ruling was more akin to a disqualification of counsel because it was based on the state's assertion that it likely would call Swartout as a witness in the case because he had met with Figella and prepared Figella's affidavit. The defendant requests review of this claim pursuant to *State* v. *Golding,* supra, 213 Conn. 239–40.[11] The state argues that Swartout's motion to withdraw was not akin to a disqualification because it was Swartout who stated that he had a conflict of interest. Furthermore, the state argues, the defendant's sixth amendment right to counsel was not violated and the court did not abuse its discretion in granting Swartout's motion because the court properly found good cause for counsel's withdrawal. We agree with the state.

"Decisions regarding the withdrawal of counsel are evaluated under an abuse of discretion standard. . . . The trial judge is the arbiter of the many circumstances which may arise during the trial in which his [or her] function is to assure a fair and just outcome." (Citations omitted; internal quotation marks omitted.) *State* v. *Fernandez,* 254 Conn. 637, 647–48, 758 A.2d 842 (2000),

[11] Under *Golding,* "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding,* supra, 213 Conn. 239–40.

cert. denied, 532 U.S. 913, 121 S. Ct. 1247, 149 L. Ed. 2d 153 (2001). "[T]he right to counsel of one's choice is not without limitation. See, e.g., *Wheat* v. *United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988) ('[t]he Sixth Amendment right to choose one's own counsel is circumscribed in several important respects'). We never have held that the right to counsel necessarily encompasses the right to a specific attorney. Thus, even if there were some evidence in the record to establish that [a particular attorney] was the defendant's counsel of choice, that interest would have to be balanced 'against the need to preserve the highest ethical standards of professional responsibility.' *United States* v. *Cunningham*, 672 F.2d 1064, 1070 (2d Cir. 1982); see also *United States* v. *Collins*, 920 F.2d 619, 626 (10th Cir. 1990), cert. denied, 500 U.S. 920, 111 S. Ct. 2022, 114 L. Ed. 2d 108 (1991) ('[c]ourts . . . must balance a defendant's constitutional right to retain counsel of his [or her] choice against the need to maintain the highest standards of professional responsibility')." *State* v. *Fernandez*, supra, 651. "Without some indication that the trial court unreasonably or arbitrarily interfered with [the] defendant's right to counsel of choice . . . [we conclude that] reversal is appropriate only when [the] defendant identifies specific prejudice resulting from [the] denial of preferred counsel, *and* when such prejudice renders the trial fundamentally unfair." (Emphasis in original; internal quotation marks omitted.) Id., 652. "[W]hen counsel makes a timely assertion of a conflict of interest, the trial court is under an affirmative obligation to make an adequate inquiry on the record to establish whether there is a conflict of interest." *State* v. *Martin*, 201 Conn. 74, 83, 513 A.2d 116 (1986).

The defendant argues that he was denied his counsel of choice in violation of the sixth amendment. Citing to *State* v. *Peeler*, 265 Conn. 460, 828 A.2d 1216 (2003),

cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004), he contends that there only was a "potential conflict of interest" in this case and that such potential was not enough to disqualify Swartout. We disagree with the defendant's contention that the court effectively disqualified Swartout in this case.[12]

The record reveals that on May 8, 2006, Swartout filed an appearance in the defendant's driving under the influence case, MV-06-0354066. In relation to that case, on August 22, 2006, Swartout prepared and signed Figella's affidavit, which affidavit later was alleged to contain false information. On August 8, 2007, because of his involvement with the preparation and signing of the false affidavit, Swartout filed a motion to withdraw from his representation of the defendant because of a potential conflict of interest. The court, *T. Sullivan, J.*, considered Swartout's motion that same day. Swartout explained to the court that there were other charges pending against the defendant and that he could not represent the defendant on those charges. He stated that he was "not necessarily really wanting to withdraw [his] appearance for reasons other than the potential for . . . a conflict somewhere along the line where [he] would be a witness and an attorney . . . ." He also stated that such a conflict, or appearance of a conflict, "would preclude [him] from adequately representing [the defendant] in the event [the case] does go to trial." The defendant voiced an objection to Swartout's motion because he did not have enough money to hire another attorney, although he was looking for one. The defendant explained that he was speaking with other attorneys regarding possible representation. The court explained to the defendant that it was possible that Swartout would be called as a witness because he had

---

[12] The record makes clear that it was the defendant, through his actions in involving Swartout in the preparation and dissemination of the false affidavit, who effectively caused Swartout to be disqualified in this case.

drafted Figella's affidavit. The defendant stated that he understood that. He also expressed a desire that attorney T. R. Paulding represent him in all pending cases. The court then continued the matter until September 12, 2007, to give the defendant time to work out a solution.

On September 12, 2007, Judge Sullivan again considered Swartout's motion to withdraw. At that hearing, the defendant acknowledged to the court that he was in the process of securing Paulding's representation on the driving under the influence case, as well as on another case. He also acknowledged that he had hired attorney Gerald Klein to represent him in yet another case. The court, again, continued the matter to give the defendant additional time to secure alternate counsel.

On October 10, 2007, Judge Sullivan held another hearing on Swartout's motion to withdraw. The defendant explained that, although Paulding was willing to accept the case, his fees were too high. The court specifically asked the defendant what he wanted to do. The defendant requested more time to find another attorney. The court agreed and continued the matter until November 7, 2007.

At the November 7, 2007 hearing, Judge Sullivan explained to the defendant that there had been many, many continuances in the cases pending,[13] specifically, twelve continuances on one file and twenty-one continuances on another, and that the cases would be placed on the ready jury list. Judge Sullivan also explained to the defendant that he would be given at least forty-eight hours notice of trial and that, when he was able to secure another attorney, the attorney should file an appearance with the court. The court then granted Swartout's motion to withdraw, and it directed that the

[13] The cases pending before the court were docket numbers MV-06-0354066 and CR-07-0143125. On June 17, 2008, these cases were consolidated.

clerk's office notify Swartout to give the defendant his file. The defendant thanked the court and wished Judge Sullivan a "[h]appy Thanksgiving."[14]

It is clear from our review of the record in this case that the defendant's initial objection to Swartout's motion to withdraw had less to do with the defendant's strong desire to have Swartout represent him and more to do with the defendant's desire to have more time to secure alternate counsel. The defendant understood and agreed with the court that it was likely that Swartout would be called as a witness in the driving under the influence case if that case went to trial. Judge Sullivan was more than understanding of the defendant's position, and he granted numerous continuances to the defendant. These continuances "served as a reasonable opportunity to retain new counsel, which is all that the sixth amendment demands in this context. See *United States* v. *Hughey*, 147 F.3d 423, 432–33 (5th Cir.), cert. denied, 525 U.S. 1030, 119 S. Ct. 569, 142 L. Ed. 2d 474 (1998)." *State* v. *Fernandez*, supra, 254 Conn. 650.

There is no indication in the record that Swartout remained the defendant's counsel of choice after the defendant understood that it was likely Swartout would be called as a witness against him. The defendant merely wanted more time, and Judge Sullivan gave him considerably more time to find alternate counsel. After a careful review of the record in this case, we conclude that the court's decision to grant defense counsel's motion to withdraw was not an abuse of discretion, nor did it deprive the defendant of his "right to counsel of choice under the sixth amendment" to the United States constitution.

---

[14] The record also reveals that, on May 20, 2008, attorney Ronald Johnson filed an appearance on the defendant's behalf. When trial commenced on January 29, 2009, both Johnson and attorney Andrew Cates were representing the defendant at trial.

## IV

The defendant claims that the court erred in convicting him of conspiracy to commit false statement in the second degree in violation of § 53a-157b,[15] and of conspiracy to fabricate physical evidence in violation of § 53a-155,[16] because these multiple convictions violated the constitutional prohibition against double jeopardy.[17] In his main brief, the defendant argues that the appropriate remedy, pursuant to *State* v. *Chicano*, 216 Conn. 699, 724–25, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), for such a violation is to remand the matter to the trial court with direction that it merge the two conspiracy counts and resentence the defendant. The defendant seeks review of his claim pursuant to *Golding*, and the state agrees with the defendant's claim and his suggested remedy.

In his reply brief, however, the defendant argues that *Chicano* should be reversed and that he was incorrect in his main brief because, pursuant to *Rutledge* v. *United States*, 517 U.S. 292, 116 S. Ct. 1241, 134 L. Ed. 2d 419 (1996), his conviction for conspiracy to commit false

[15] General Statutes § 53a-157b provides in relevant part: "(a) A person is guilty of false statement in the second degree when he intentionally makes a false written statement under oath or pursuant to a form bearing notice, authorized by law, to the effect that false statements made therein are punishable, which he does not believe to be true and which statement is intended to mislead a public servant in the performance of his official function. . . ."

[16] General Statutes § 53a-155 provides in relevant part: "(a) A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he . . . (2) makes, presents or uses any record, document or thing knowing it to be false and with purpose to mislead a public servant who is or may be engaged in such official proceeding. . . ."

[17] "The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . . This constitutional provision is applicable to the states through the due process clause of the fourteenth amendment." (Internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 172 n.39, 869 A.2d 192 (2005).

statement should be *vacated and dismissed,* and the matter should be remanded to the trial court for resentencing. We conclude that we are bound by *State* v. *Chicano,* supra, 216 Conn. 724–25, and its progeny, including *State* v. *Padua,* 273 Conn. 138, 171–73, 869 A.2d 192 (2005), and we cannot revisit for purposes of reexamination or reevaluation the precedent established by our Supreme Court. See *State* v. *Cecarelli,* 32 Conn. App. 811, 826 n.1, 631 A.2d 862 (1993) (as intermediate appellate court, we cannot revisit Supreme Court holding in *Chicano*); see also *State* v. *Polanco,* 126 Conn. App. 323, 339 and n.8, 11 A.3d 188 (relying on *Chicano* and its progeny in declining to consider defendant's claim that one conviction should be vacated rather than merged), cert. granted, 300 Conn. 933, 17 A.3d 69 (2011); but see *State* v. *Johnson,* 137 Conn. App. 733, 756, 49 A.3d 1046 (2012). Nevertheless, we also conclude that the defendant's conviction on both conspiracy counts violates the constitutional prohibition against double jeopardy. Accordingly, we agree with the state that, as charged, the conviction of conspiracy to commit false statement, a class A misdemeanor, must be merged with the conviction of conspiracy to fabricate physical evidence, a class D felony, and the sentence on the conviction of conspiracy to commit false statement must be vacated and the defendant must be resentenced.

Where a defendant is convicted of two counts of conspiracy that arise from the same agreement, resulting in two sentences, the defendant's rights under the double jeopardy clause have been violated. *State* v. *Padua,* supra, 273 Conn. 172. The appropriate remedy for such a constitutional violation, pursuant to *State* v. *Howard,* 221 Conn. 447, 604 A.2d 1294 (1992), and *State* v. *Chicano,* supra, 216 Conn. 699, is to combine the conspiracy convictions, to vacate the sentence for one of the offenses, and to sentence the defendant only

for the remaining offense, reflecting the intent of the sentencing court. *State* v. *Padua*, supra, 172, 173–74.

The state concedes, and we agree, that, in this case, the defendant was charged with two conspiracies arising from a single unlawful agreement. The information charging the defendant with both crimes alleges that both conspiracies were entered into on the same date, in the same location, with the same person: "[A]t various times and locations including, but not limited to, the [t]own of Enfield on or about August 22, 2006, [the defendant] . . . did agree with another person . . . Figella to cause the performance of such conduct and either one of them committed an overt act in pursuance of the conspiracy, to wit . . . Figella swore to and executed a false affidavit that served to exculpate [the defendant] in pursuance of the conspiracy . . . ." "Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one. . . . The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute . . . . For such a violation, only the single penalty prescribed by the statute can be imposed." (Internal quotation marks omitted.) *State* v. *Padua*, supra, 273 Conn. 173. Thus, it is clear that the defendant's multiple conspiracy convictions must be merged and his sentence on one of them must be vacated. "[W]hen deciding which of two sentences to vacate when both cannot stand, the determinative factor is the intention of the sentencing judge." (Internal quotation marks omitted.) Id. In this case, the court sentenced the defendant to a consecutive term of five years imprisonment, execution suspended after three years, followed by three years of probation, on the

felony charge of conspiracy to fabricate physical evidence, and the court sentenced the defendant to a consecutive term of one year imprisonment, execution suspended, followed by two years of probation, on the misdemeanor charge of conspiracy to make a false statement in the second degree. We conclude that the sentencing court intended for the sentence on the conviction of conspiracy to fabricate physical evidence to control. See id., 174. Accordingly, on remand, we direct the trial court to merge the conviction on the two conspiracy charges, to vacate the defendant's sentence on the conviction of conspiracy to make a false statement in the second degree and to sentence the defendant only for conspiracy to fabricate physical evidence.

V

The defendant's final claim is that the court's jury instructions on both conspiracy counts improperly misled the jury on the element of intent because the court failed to inform the jury that the state had to prove that the defendant knew that Figella would sign an affidavit containing false information with the intent that the affidavit would be given to the state's attorney to mislead her or him. Although admitting that he did not submit a request to charge, he contends that counsel did object to the court's proposed conspiracy charge, but, he, nevertheless, requests review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. The state argues that the defendant waived this claim and, in the alternative, that the court properly instructed the jury on the element of intent. We conclude that the defendant waived the claim of instructional error.

The defendant did not submit proposed jury instructions to the court. On the morning of February 2, 2009, before testimony resumed, the court gave the parties a written copy of its proposed instructions. Following

witness testimony, the court recessed at 1:20 p.m., indicating that it would give counsel "some time this afternoon to review what [it had] put together and [that it would] have a meeting th[at] afternoon regarding any exceptions that [counsel] might see with respect to the charge and any additions that [they] think might be appropriate or other corrections that may be appropriate with respect to the charge." With the agreement of the state and defense counsel, the court stated that it would hold the charging conference in chambers at 3:15 p.m. The next day, the court stated that the charging conference had gone forward the previous afternoon and that the state had agreed at the conference to withdraw the charge of conspiracy to commit forgery in the third degree against the defendant. The court also stated that it had adopted a few changes to the proposed jury instructions that had been requested by the state and by defense counsel. Before proceeding to hear argument on the defendant's motion for judgments of acquittal,[18] the court then asked if it was correct that there were no disagreements on the charge. Defense counsel and counsel for the state responded that the court was correct. Following the court's charge to the jury, it asked counsel if there were any exceptions to the charge. Defense counsel responded that he had a concern about the definition of conspiracy, and the court explained that it understood the concern but that it had used the standard charge. Counsel voiced no other exceptions or concerns, nor did he indicate any objections to the court's instructions on the intent elements of the conspiracy charges.

"A defendant in a criminal prosecution may waive one or more of his or her fundamental rights. . . . [I]n the usual *Golding* situation, the defendant raises a claim on appeal [that], while not preserved at trial, at least was not waived at trial. . . . [A] constitutional claim

---

[18] The court denied the defendant's motion for judgments of acquittal.

that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . . This court has stated that among the rights that may be waived by the action of counsel in a criminal proceeding is the right of a defendant to proper jury instructions." (Citations omitted; internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 467, 10 A.3d 942 (2011); see also *State* v. *Paige*, 304 Conn. 426, 435, 40 A.3d 279 (2012) ("waiver of the right to require the state to prove each element of a crime may be made by counsel" [internal quotation marks omitted]); *State* v. *Darryl W.*, 303 Conn. 353, 367 n.15, 33 A.3d 239 (2012) (no merit to defendant's "claim that the right to proper instruction on the elements of an offense is fundamental and therefore not waivable by counsel").

"[W]hen the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." *State* v. *Kitchens*, supra, 299 Conn. 482–83. "[A] defendant will not be deemed to have waived [an instructional] claim unless the court has provided counsel with a copy of the proposed instructions and a meaningful opportunity for review and comment, which can be determined in any given case only by a close examination of the record. The significance of a *meaningful opportunity* for review and comment cannot be underestimated." (Emphasis added.) Id., 495 n.28.

The defendant argues that he did not waive the right to review of this claim because the few hours given between the court's recess and the charging conference did not amount to a "meaningful opportunity" to review the court's proposed instructions and that he did raise a concern about the court's jury charge on conspiracy after the court fully instructed the jury. We are not persuaded.

The court gave defense counsel a written copy of its proposed instructions on the morning of February 2, 2009. When the court recessed at 1:20 p.m., the parties agreed to meet for the charging conference at 3:15 p.m. in chambers, and they did so. The next day, the court acknowledged that it made some changes to its proposed instructions on the basis of requests from defense counsel and the state. It also stated that the state had agreed, during the conference, to amend its information to omit one of the charges against the defendant. During the court's discussion with counsel regarding the changes it had made on the basis of the parties' suggestions, defense counsel did not voice any objections, and he acknowledged that there was no disagreement as to the court's changes. Furthermore, even after the jury was instructed, defense counsel, although stating that he had a concern about the *definition* of conspiracy, did not voice any objection to the court's instruction on the *intent elements* of the conspiracy charges.[19]

Even if we were to agree with the defendant's assertion that the time given to review the instructions on the afternoon of February 2, 2009, did not amount to a "meaningful opportunity," defense counsel had the entire evening to further review the instructions and

[19] In order to preserve an objection to a proposed jury instruction, "the defendant must plainly put the trial court on notice as to the specific basis for his objection; see Practice Book § 60-5; *State* v. *Jose G.*, 290 Conn. 331, 342–43, 963 A.2d 42 (2009) . . . ." *State* v. *Coleman*, 304 Conn. 161, 174, 37 A.3d 713 (2012).

could have raised any concerns to the court the next day. See *State* v. *Fontaine*, 134 Conn. App. 224, 231, 40 A.3d 331 (counsel, who was given overnight to review proposed jury charge, had meaningful opportunity to do so), cert. denied, 304 Conn. 926, 41 A.3d 1051 (2012). Defense counsel indicated, however, that he had no disagreement with the court's instructions and, even when he did raise a concern following the instructions, he stated only that his concern was with the *definition* of conspiracy. Accordingly, we conclude that the defendant implicitly has waived his right to review of this claim.

The judgment in the second case is reversed in part and the case is remanded with direction to merge the conviction of conspiracy to commit false statement with the conviction of conspiracy to fabricate physical evidence, to vacate the sentence on the conviction of conspiracy to commit false statement and to resentence the defendant on the conviction of conspiracy to fabricate physical evidence. The judgments are affirmed in all other respects.

In this opinion the other judges concurred.