******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* KEITH FULLER
(AC 36178)

Beach, Keller and Harper, Js.

*Argued March 11—officially released July 7, 2015*

(Appeal from Superior Court, judicial district of New Haven, geographical area number twenty-three, Mullins, J.)

*Adele V. Patterson*, senior assistant public defender, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Marc G. Ramia*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Keith Fuller, appeals from the judgment of conviction, rendered following a jury trial, of burglary in the first degree in violation of General Statutes § 53a-101 (a) (3) and larceny in the sixth degree in violation of General Statutes § 53a-125b (a).[1] The defendant claims that the court erred by failing to provide the jury with instructions concerning the reliability of the results of the show-up procedure, by which the victim identified him as the perpetrator of the crimes, and the reliability of the statements made by the victim that he was confident in his identification. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On March 29, 2012, the victim, John Ziebell, along with his wife and his child, were residing in a first floor apartment on Goffe Terrace in New Haven. At approximately 9 p.m., after his wife and child were asleep, Ziebell went for an outdoor walk with his two dogs. Upon returning to his apartment at approximately 9:30 p.m., Ziebell observed the defendant, who previously was unknown to him, exiting the apartment while carrying a flat screen television. Although it was dark outside, the area was well lit by means of street lamps. Ziebell rapidly approached the defendant and said, "excuse me, that's my T.V."

The defendant, while carrying the television, made his way out of the residence, down the porch stairs, and onto the sidewalk. The defendant threatened physically to harm Ziebell and stated that Ziebell would not do anything about it. Using his cell phone, Ziebell reported the incident to the police. He remained on the telephone with the police dispatcher while he pursued the defendant on foot, accompanied by his dogs. The interaction between the two men drew the attention of one of Ziebell's neighbors, Timothy Newson, who exited his residence to investigate what was occurring.

Ziebell screamed to Newson, "Tim, Tim, this guy was in my house, he was in my house." In front of Newson's residence, the defendant carefully placed the television on a grassy surface near the roadway and, in an attempt to flee from Ziebell, hurriedly proceeded on foot away from Ziebell and toward the intersection with Ella Grasso Boulevard. Shortly thereafter, he walked back toward an automobile that was parked in front of Newson's residence. When the defendant was within approximately ten to fifteen feet of the automobile, he shouted "go, go, go." The driver of the automobile drove toward the defendant, who got into the automobile. The automobile left the scene, and the television set remained on the grass where the defendant had left it. Ziebell provided the police with information about the perpetrator's appearance as well as information concerning the marker plate and color of the automobile.

After the automobile drove off, Ziebell entered his residence for a brief time. He observed that his wife and son were safely asleep. Also, Ziebell observed that there was fresh damage to his front door, the defendant's point of entry.

Within minutes after the automobile carrying the defendant left, police officers arrived on the scene. Within a few minutes of their arrival, the officers learned that other officers had stopped an automobile that matched the description of the suspect automobile provided by Ziebell. At that time, the police transported Ziebell in a police cruiser to the area of Winthrop Avenue and Maple Street, which was approximately one to two minutes away. There, by means of a show-up identification procedure,[2] Ziebell immediately and positively identified the defendant as the perpetrator.[3] Following Ziebell's identification, the defendant was arrested and charged with crimes related to this incident.[4] The defendant appealed to this court following his conviction of burglary in the first degree and larceny in the sixth degree.

Because the sole claim of instructional error raised in the present appeal relates to the evidence of the identification of the defendant made by Ziebell upon his arrival at the area of Winthrop Avenue and Maple Street, we shall turn our attention to the evidence related thereto. Ziebell testified that, within minutes after the police first arrived at his residence, he was transported in the back of a police cruiser to the nearby area of Winthrop Avenue and Maple Street, where he was asked to identify a suspect who was in police custody.

During his direct examination, the following colloquy between the prosecutor and Ziebell occurred:

"Q. And what happened when you arrived at that location?

"A. I [saw] . . . that there was officers already on the scene and that they had somebody in custody. They had this guy in custody. The guy who was coming out the front door with the T.V.

"Q. And did they ask you to identify the individual?

"A. Yes, they did.

"Q. The individual that they asked you to identify, did you recognize the individual—

"A. Immediately.

"Q. —at that point? And how did you recognize that person?

"A. By his face, his build, base build, clothing.

"Q. And was that the individual that you saw leaving your residence with your T.V.?

"A. Yeah, he was three feet away from me when I first confronted him. The length of my dogs."

Later, during the state's direct examination of Ziebell, the following colloquy between the prosecutor and Ziebell occurred:

"Q. Now, when you were brought to Winthrop [Avenue] and Maple [Street] . . . you were asked to identify the individual. Was there any doubt in your mind that the individual you saw that evening was the individual that you saw holding your T.V. on your front porch?

"A. No doubt, whatsoever. I mean, he was . . . closer than we are apart right now."

During their direct examinations by the state, both Ziebell and Newson identified the defendant, who was present in the courtroom at trial, as the perpetrator of the crimes. In this appeal, the defendant does not raise any claims related to these in-court identifications.

Also relevant to the issue of the show-up identification made by Ziebell, the state presented testimony from Detective Jessica Stone, who was a patrol officer with the New Haven police department on March 29, 2012. Stone testified that she responded to the crime scene on Goffe Terrace, received a description of the automobile involved, and, within minutes of her arrival, transported Ziebell to the suspect that the police had in custody at Winthrop Avenue near Maple Street. The following colloquy between the prosecutor and Stone occurred:

"Q. And what happened when you arrived at that particular location?

"A. I conducted a one-on-one ID with my victim and the suspect.

"Q. And can you explain . . . what a one-on-one identification is and what the purpose of that investigation was?

"A. So a one-on-one is when you have a victim in a vehicle. He stays in the back of my patrol car and we take our spotlight of our patrol car and we put it on the person that could or could not be the suspect and approximately twenty feet from the person that's supposedly the suspect and you put the light on them and . . . the patrol officer will take the suspect and he stands out there and the victim will say . . . if it is or isn't a suspect and they're a hundred percent sure or they're not a hundred percent sure." Stone testified that by means of that procedure, Ziebell positively identified the defendant as the person whom he had observed exiting his home.

The defendant did not move to suppress evidence related to Ziebell's identification of him on March 29, 2012, nor did he object to the presentation of evidence concerning the show-up identification. Moreover, the defendant did not request that the court provide the jury

with any instructions regarding the evidence related to the identification, including Ziebell's statements that he did not have any doubt about his identification. The court instructed the jury in relevant part that "the State must prove each element of each offense including the identification of the defendant beyond a reasonable doubt." The court, however, did not provide the jury with the type of instructions that are at issue in the present claim, and the defendant did not take an exception to the court's charge on this ground.

For the first time on appeal, the defendant claims that the court erroneously failed "to provide the jury with necessary cautions to avoid the risks of misidentification from the suggestive show-up procedure . . . ." Also, for the first time on appeal, the defendant claims that the court erroneously failed to instruct the jury that Ziebell's confident assessment at trial of his identification "has a weak correlation to [the] accuracy [of his identification]." The defendant characterizes the "critical issue" in this case as one of identification. He argues: "The circumstances of Ziebell's identification of the defendant constitute[d] an inherently suggestive show-up identification. The police told [Ziebell] that they had apprehended someone, took him to that person, who was in custody, shined a spotlight on the suspect and displayed the accused surrounded by police officers. After Ziebell identified the defendant as the robber, the police kept him on the scene for about half an hour watching as the officers seized items from him and brought them to Ziebell for confirmation that these [items] belonged to him."[5] Further, he argues that the record clearly demonstrates that the police had elicited Ziebell's identification of him by means of a suggestive show-up procedure and that the police thereafter had relied on Ziebell's positive identification of him.

The defendant raises an unpreserved claim of instructional error related to the reliability of identification evidence. The claim is not constitutional in nature. See, e.g., *State* v. *Bullock*, 155 Conn. App. 1, 19–20, 107 A.3d 503, cert. denied, 316 Conn. 906,      A.3d      (2015), and cases cited therein. In an attempt to obtain extraordinary review of the claim, the defendant urges us to exercise our supervisory powers to *require* that a trial court deliver cautionary instructions to juries in cases such as the present case, which he characterizes as involving a suggestive show-up identification procedure. In so doing, he relies on *State* v. *Ledbetter*, 275 Conn. 534, 579, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006), in which our Supreme Court, in the exercise of its supervisory powers, directed trial courts to instruct juries about the risk of misidentification in cases in which "(1) the state has offered eyewitness identification evidence; (2) that evidence resulted from an identification procedure; and (3) the administrator of that procedure failed to instruct the witness that the perpetrator may or may

not be present in the procedure." In his appeal to the exercise of our supervisory authority, the defendant urges us to apply the "reasoning and principles developed . . . in *Ledbetter*" to the unique facts of the present case. In the alternative, the defendant urges us to interpret *Ledbetter* such that it required the court to deliver cautionary instructions in the present case and, thus, the court's failure to deliver such instructions constituted plain error.

I

The state argues that we should decline to review the defendant's claim under any appellate standard because, at trial, he implicitly waived the present objection to the court's jury charge by expressing his satisfaction with the court's proposed charge that did not include the instruction at issue. Relevant to the issue of waiver in the context of jury instruction claims, our Supreme Court stated that "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal. Such a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case." *State v. Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011). To determine whether, as is argued by the state, the *Kitchens* doctrine of implicit waiver is implicated by the unique circumstances of this case, we will turn to a close examination of the record of proceedings at trial.[6]

The record reflects that the presentation of evidence in this case took place on May 29 and May 30, 2013. On May 29, 2013, the court informed the prosecutor and the defendant's two trial attorneys that it would email the parties a copy of its proposed jury charge that evening, or provide them with a copy of its proposed charge on the morning of the next day, May 30, 2013. Also, the court instructed the parties to provide it with any requests to charge on the morning of May 30, 2013, in advance of a charge conference to be held later that afternoon.

Although it is not clear from the record whether the court sent a copy of its proposed charge to the parties on the prior evening or whether the court delivered a copy to the parties on that day, the record reflects that at the beginning of the proceeding that commenced on the morning of May 30, 2013, the parties represented that they were in possession of a copy of the court's proposed charge. Thereafter, prior to the lunch recess, the state concluded its case-in-chief; the state rested

its case, the court took up the issue of, and ultimately denied, the defendant's motion for a judgment of acquittal, and the defense rested its case. Outside of the jury's presence, the court held a charging conference on the record with the attorneys. During this conference, the court and the attorneys discussed specific instructions contained in the court's proposed charge. The court made reference to specific instructions and provided the parties with an overview of its charge by referring to the various instructions set forth in its proposed charge. During the conference, both of the defendant's attorneys voiced objections about various instructions, or the absence of instructions, in the proposed charge. Neither party, however, raised any issue with regard to the lack of an instruction concerning eyewitness identification evidence. At the conclusion of the conference, the court asked the parties if they wished to request any other instructions, to which one of the defendant's attorneys replied: "None from the defense."

Following the conference, the court stood in recess for lunch. During the recess, which lasted approximately one and one half hours, the court incorporated changes to the charge that it had discussed with the parties during its earlier conference. Thereafter, the court provided copies of its revised charge to the parties. When the proceeding resumed following the lunch recess, the court reviewed with the parties the extent of the changes it had made as a result of the charging conference, and asked the parties if there was "anything else" to discuss before proceeding to closing argument. One of the defendant's attorneys replied: "Nothing from the defense." Following closing arguments, the court delivered its charge to the jury. Neither the prosecutor nor the defendant's attorneys took any exceptions to the court's charge.

Thus, the record demonstrates that the court actively circulated and sought review of a proposed charge that did not contain an instruction addressing the fallibility of eyewitness identifications. After being afforded a meaningful opportunity to review the charge,[7] the defendant's attorneys did not request such an instruction and did not object to the charge on this ground. When the court, on multiple occasions, solicited comments from counsel concerning its proposed charge, neither of the defendant's attorneys raised the present concern, but replied that there were no issues with the charge apart from those concerns that they had raised previously, which were unrelated to the present claim. We conclude that, under *Kitchens*, the defendant implicitly waived his claim that the court improperly omitted an instruction related to the fallibility of the eyewitness identification evidence.

II

Because we have concluded that, at trial, the defendant waived his right to raise the present claim of

instructional error, we reject his argument that the court committed plain error. As our Supreme Court observed in *Kitchens*, "a valid waiver precludes a finding that a jury instruction constitutes plain error because a valid waiver means that there is no error to correct." *State* v. *Kitchens*, supra, 299 Conn. 474 n.18; see also *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 70, 967 A.2d 41 (2009) (reasoning that valid waiver thwarts "review" under plain error doctrine); cf. *State* v. *Darryl W.*, 303 Conn. 353, 371–72 n.17, 33 A.3d 239 (2012) (noting tension between certain Supreme Court decisions as to whether reversal on the basis of plain error could be available in cases in which alleged error is causally connected to defendant's own behavior). This court has adhered to the view that waiver thwarts a finding that plain error exists. See, e.g., *State* v. *McClain*, 154 Conn. App. 281, 293, 105 A.3d 924 (2014); *State* v. *Reddick*, 153 Conn. App. 69, 82, 100 A.3d 439, appeal dismissed, 314 Conn. 934, 102 A.3d 85, and cert. denied, 315 Conn. 904, 104 A.3d 757 (2014); *State* v. *Cancel*, 149 Conn. App. 86, 102–103, 87 A.3d 618, cert. denied, 311 Conn. 954, 97 A.3d 985 (2014).

### III

Although the state urges us to conclude that the defendant's waiver likewise is fatal to his request that we exercise our supervisory authority to review the claim, we observe that our case law does not lead us to conclude that a waiver *necessarily* precludes a reviewing court from exercising its inherent supervisory authority, but that such a determination is made in light of the particular facts of each case. Compare *State* v. *Revelo*, 256 Conn. 494, 502–504, 775 A.2d 260 (after concluding that "case presents one of the rare exceptions to the general rule of unreviewability" court exercises supervisory authority to review waived claim), cert. denied, 534 U.S. 1052, 122 S. Ct. 639, 151 L. Ed. 2d 558 (2001); *State* v. *Castillo*, 121 Conn. App. 699, 716 n.17, 998 A.2d 177 (court exercises supervisory authority to review waived claim), cert. denied, 297 Conn. 928, 998 A.2d 1196, cert. denied, 562 U.S. 1094, 131 S. Ct. 803, 178 L. Ed. 2d 537 (2010) with *State* v. *Opio-Oguta*, 153 Conn. App. 107, 120 n.12, 100 A.3d 461 (court concludes that there is "[no] compelling reason" to exercise supervisory authority to review waived claim), cert. denied, 314 Conn. 945, 102 A.3d 1115 (2014); *State* v. *Gentile*, 75 Conn. App. 839, 848, 818 A.2d 88 (court concludes that there is "no reason" to exercise supervisory authority to review waived claim), cert. denied, 263 Conn. 926, 823 A.2d 1218 (2003).

"Supervisory authority is an extraordinary remedy that should be used sparingly . . . . Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle. . . . Our supervisory powers are not

a last bastion of hope for every untenable appeal. They are an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts. . . . Overall, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . Thus, we are more likely to invoke our supervisory powers when there is a pervasive and significant problem . . . or when the conduct or violation at issue is offensive to the sound administration of justice . . . .” (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Edwards*, 314 Conn. 465, 498–99, 102 A.3d 52 (2014); see also *State* v. *Rose*, 305 Conn. 594, 607, 46 A.3d 146 (2012) (emphasizing well-settled view that supervisory authority is an extraordinary remedy to be exercised sparingly); *State* v. *Wade*, 297 Conn. 262, 296, 998 A.2d 1114 (2010) (same); *State* v. *DeJesus*, 288 Conn. 418, 482, 953 A.2d 45 (2008) (same).

Assuming that, despite a waiver, a record is adequate to review a waived claim of error, a waiver does not otherwise legally or logically preclude a reviewing court from exercising its supervisory authority to review such a claim, and, thereafter, to order what, if any, remedy that it deems appropriate. Waiver, of course, may arise in a variety of contexts, and “[t]here is no dispute that, for reasons of strategy, counsel may knowingly and intentionally waive a defendant's constitutional right to a particular jury instruction despite the fundamental nature of the defendant's due process entitlement to an adequate jury charge.” *State* v. *Kitchens*, supra, 299 Conn. 533–34 (*Palmer, J.*, concurring). Yet, we recognize that, having waived a claim of instructional error, even one of constitutional magnitude, an appellant bears a heavy burden of demonstrating that it is appropriate for a reviewing court, in the exercise of its supervisory authority, to review such a claim on appeal. This seems to be especially true in cases in which there are indications that a waiver was the product of a trial strategy. *State* v. *Berube*, 256 Conn. 742, 748–49, 775 A.2d 966 (2001) (discussing waiver of constitutional rights based on trial strategy). In the interest of fairness, both to the court and the opposing party, it is appropriate that parties to an appeal be bound by the consequences of their trial strategy. “Our appellate courts frequently have stated that a party may not pursue one course of action at trial for tactical reasons and later

on appeal argue that the path he rejected should now be open to him." (Internal quotation marks omitted.) *State* v. *Davis*, 76 Conn. App. 653, 662, 820 A.2d 1122 (2003). To allow the defendant to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state and the trial court with that claim on appeal. *State* v. *Foster*, 293 Conn. 327, 339, 977 A.2d 199 (2009); *State* v. *Colon*, 272 Conn. 106, 246, 864 A.2d 666 (2004).

Although we may infer from the defendant's implicit waiver of any objection to the court's charge that the defense assented to that charge, there are even more compelling reasons that militate against the exercise of our supervisory authority in the present case. The defendant takes issue with the court's charge because, characterizing the case as resting on the factual issue of the identity of the individual at his residence on the evening of March 29, 2012, he argues that the court should have instructed the jury concerning the fallibility of Ziebell's identification of him as that individual. That is, he now raises as a claim of error that the court did not proactively deliver an instruction that would have alerted the jury to the fallibility of Ziebell's identification of him during the show-up procedure and Ziebell's testimony that he was confident in the accuracy of his identification.

Contrary to the defendant's present characterization of the central factual issue before the jury, a review of what transpired at trial reflects that not only did the defense not challenge in any meaningful manner the identification evidence presented by the state or request the instruction at issue, but that the defendant's theory of the case, developed during the presentation of evidence and articulated during closing argument, clearly was harmonious with the very evidence that is the subject of the present claim. The theory was that, by virtue of a consensual agreement between the defendant and Ziebell, the defendant *was* involved in the incident at Ziebell's home on the evening of March 29, 2012, and in possession of the items taken therefrom. Thus, at trial, the defendant effectively conceded the element of identity.

Specifically, we observe that, at trial, the defendant presented evidence that Ziebell had a criminal history. During cross-examination, the defense elicited testimony from Ziebell that he was "an addict in recovery" and that he had a prior felony conviction for robbery that was related to his substance abuse. The defendant's attorney asked Ziebell several questions in an attempt to demonstrate that he was familiar with the defendant prior to the events at issue, he was addicted to illegal drugs at the time of the events at issue, and that the defendant was present at his house pursuant to an agreement between the defendant and Ziebell related

to an illegal drug exchange. The defendant's attorney asked: "Isn't it true that this was more than someone coming out of your house and, in fact, that you knew this person was coming to your house?" Ziebell answered in the negative. The defendant's attorney asked: "Isn't it true . . . you've known [the defendant] for a year and a half?" Ziebell answered that this was not true. The defendant's attorney asked: "Isn't it true that . . . you allowed him to use an unemployment card before?" Ziebell answered that this was not true. The defendant's attorney asked: "Isn't it true, Mr. Ziebell, that the reason why you didn't immediately go into the house and check on your wife and son is that your wife already had come out of the house and saw you with the T.V.?" Ziebell replied, "No." The defendant's attorney asked: "Isn't it . . . true that the reason why you called the police is that you had to cover the fact that you were taking items out of your own home?" Ziebell replied, "No."

A review of the defendant's closing argument reveals that the theory of defense was to challenge Ziebell's credibility and to argue that the most reasonable interpretation of the evidence was that Ziebell was the party who removed the stolen items from his home and voluntarily gave them to the defendant in exchange for illegal drugs.[8] During argument, the defendant's attorneys stated: "The defense all along has contended that this was a quid pro quo. This wasn't a burglary. This . . . didn't involve threatening or a larceny. This was a quid pro quo." The defense did not attempt to challenge the accuracy of Ziebell's observations or his identification of the defendant; in no way did the defense suggest that Ziebell mistakenly identified the defendant. Instead, the defendant's attorney devoted the entirety of her argument to challenging Ziebell's version of events, suggesting that his account of what had occurred was not credible in its own right and that his actions during the purported burglary actually revealed his attempt to conceal the true nature of what had transpired between himself and the defendant. The defendant's attorney argued that Ziebell had called 911 "to cover himself." She argued: "We contend that Mr. Ziebell made the 911 call because he knew that his wife . . . who interrupted this quid pro quo, would be upset with him because of the fact that he was taking a T.V. out of the house." The defendant's attorney referred to evidence that Ziebell had a history of unemployment and that his financial circumstances may have been such that he did not have cash to purchase drugs. She argued: "I don't know if Mrs. Ziebell was working. I don't know what their financial situation was. He testified that he used cash in the past [to purchase drugs], but . . . quid pro quos happen." She went on to argue that the evidence supported a finding that Ziebell probably used illegal drugs at the time of the incident and that this incident involving the defendant "was a trade."

As reflected by these facts, the theory of the case

advanced by the defense at trial was that the defendant was present at the alleged crime scene and that the defendant was in possession of the items purportedly stolen from Ziebell's residence as part of a consensual yet illegal transaction between the defendant and Ziebell, the nature of which, at the very least, Ziebell intended to conceal from his wife by means of falsely reporting the incident to the police. By calling the occurrence "a trade" and "a quid pro quo," the defense, far from suggesting that Ziebell was unable accurately to identify the person present at his residence on March 29, 2012, unmistakably asked the jury to infer that the defendant and Ziebell knew one another and had reached an agreement that involved the defendant's receipt of the items at issue.

The defendant now claims that the court improperly failed to instruct the jury concerning the probability that Ziebell may have misidentified him. The defendant, therefore, essentially urges us to conclude that the court, sua sponte, should have provided the jury with an instruction that would have undermined his theory of defense by inviting the jury to consider whether the identification made by Ziebell, that was entirely consistent with the defense's theory of what had transpired during the events at issue, was the product of a flawed identification procedure. Stated otherwise, any error on the court's part concerned an issue that, as a result of defense strategy, was not at issue in the case. The claim, essentially arguing that the trial court sua sponte should have taken action that was contrary to the defense, weighs heavily against the exercise of our supervisory authority. See, e.g., *State* v. *Ashe*, 74 Conn. App. 511, 527, 812 A.2d 194 (exercise of supervisory authority to review unpreserved claim of prosecutorial impropriety unwarranted because claimed impropriety concerned matter that was not central to the factual issues disputed by parties), cert. denied, 262 Conn. 949, 817 A.2d 108 (2003).

Additionally, we already have explained that the defendant argues that the identification procedure in this case either fell within the ambit of *Ledbetter* or that this court should extend *Ledbetter* such that it applies in a case involving the type of identification procedure at issue. Even if it were appropriate for us to review the claim under any extraordinary means of review, we observe that the claim would fail because, in light of the defendant's theory of the case, it did not involve a significant risk of misidentification. *Ledbetter* applies in cases in which there is a risk of misidentification, not in every case involving an identification procedure. Thus, in exercising its supervisory authority to lessen the risk of misidentification, the court in *Ledbetter* stated: "Therefore, *unless there is no significant risk of misidentification,* we direct the trial courts of this state to incorporate an instruction in the charge to the jury, warning the jury of the risk of misidentification,

in those cases where: (1) the state has offered eyewitness identification evidence; (2) that evidence resulted from an identification procedure; and (3) the administrator of that procedure failed to instruct the witness that the perpetrator may or may not be present in the procedure." (Emphasis added; footnote omitted.) *State* v. *Ledbetter*, supra, 275 Conn. 579.

The defendant implicitly waived any objection to the court's charge on the basis of its failure to instruct the jury concerning the risk of misidentification. Moreover, when viewed in light of the defendant's theory of the case, which eliminated the risk of misidentification, this waiver appears to have been part of a rational trial strategy that provided explanation, contrary to that presented by the state, for the defendant's activities at Ziebell's residence. The present circumstances do not call into question the integrity of the judicial system or implicate any of the other serious concerns that would warrant the exercise of our supervisory powers to afford the defendant relief.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court imposed a total effective sentence of fifteen years incarceration, execution suspended after ten years, followed by five years of probation. Additionally, we note that the jury returned a verdict of not guilty with regard to one count of threatening in the second degree in violation of General Statutes § 53a-62 (a) (2).

[2] A "show-up" procedure is "the presentation of a single suspect to an eyewitness for possible identification." *State* v. *Findlay*, 198 Conn. 328, 337, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986).

[3] After Ziebell identified the defendant as the perpetrator, Ziebell identified a number of items that the police had found on the defendant as belonging to him. These items included a television remote control, two controllers for a videogame system, a Gameboy system, and prescription medicine. The police returned these items to Ziebell.

[4] The police ascertained the true identity of the defendant, who initially had falsely identified himself to the police as "Danny Mobley," by means of his fingerprints.

[5] We observe that, although the defendant uses the word "robber" in argument before this court, he was not charged with the crime of robbery.

[6] To the extent that the defendant argues that *Kitchens* should be overruled, we observe that such an argument cannot persuade this court. "As an intermediate court of appeal, we are unable to overrule, reevaluate, or reexamine controlling precedent of our Supreme Court." *State* v. *LaFleur*, 156 Conn. App. 289, 302, 51 A.3d 1048 (2015).

[7] In opposing the state's reliance on *Kitchens*, the defendant argues that the court did not afford the parties a meaningful opportunity to review its proposed charge. The defendant does not dispute that counsel had a copy of the court's proposed charge prior to the time that the proceeding commenced on the morning of May 30, 2013, that the court discussed the proposed charge with counsel prior to the lunch recess, that the defendant had requested certain instructions during that conference, that counsel thereafter had an hour and a half lunch recess, or that, after the lunch recess but before it delivered its charge, the court addressed counsel concerning changes it had made to its proposed charge. Nor does the defendant contest that, at trial, his trial attorneys expressed satisfaction with the court's proposed charge.

Our case law does not provide an exact definition of what constitutes a meaningful opportunity for review under *Kitchens*. See *State* v. *Kitchens*, supra, 299 Conn. 495 n.28 ("The significance of a meaningful opportunity for review and comment cannot be underestimated. Holding an on-the-record charge conference, and even providing counsel with an advance copy of the instructions, will not necessarily be sufficient in all cases to constitute waiver of *Golding* review if defense counsel has not been afforded adequate time, under the circumstances, to examine the instructions and to identify

any potential flaws."); see also *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Prior decisions of this court have held that an opportunity to review a proposed charge overnight amounts to an opportunity for meaningful review. See, e.g., *State* v. *Lee*, 138 Conn. App. 420, 453–54, 52 A.3d 736 (2012); *State* v. *Fontaine*, 134 Conn. App. 224, 231, 40 A.3d 331, cert. denied, 304 Conn. 926, 41 A.3d 1051 (2012). There is no basis, however, to suggest that a meaningful opportunity for review necessarily involves an opportunity to review proposed instructions overnight.

A close review of the events involving the court's proposed charge, as set forth previously in this opinion, reflects that the parties were in possession of the court's proposed charge prior to the start of the proceeding on May 30, 2013. During the charging conference that took place prior to the lunch recess, the court provided counsel with an overview of the instructions set forth in its proposed charge. During the conference, the defendant's attorneys objected to certain instructions and the absence of other instructions. The comments made by the defendant's attorneys demonstrated that they were, to some degree, familiar with the content of the charge. Thereafter, the court afforded the parties a lunch recess that was one hour and a half in duration. When court reconvened, the court indicated that it had revised its proposed charge in accordance with the charging conference. Both prior to and following the lunch recess, in response to inquiry by the court, the defense indicated that it did not have any additional objections to the proposed charge. Beyond their failure to request, either orally or in writing, the instruction at issue in the present claim, or to state an objection on the ground that the proposed charge did not contain such an instruction, at no time did either of the defendant's attorneys indicate that they did not have an opportunity to review the proposed charge or that they desired a greater opportunity to do so.

This trial was neither lengthy nor overly complex, and the same is true of the court's charge. Beyond the inclusion of several boilerplate instructions, the court provided instructions concerning three substantive offenses. The defendant's claim concerns the *absence* of a specific instruction, not the precise wording of one of the court's proposed instructions. In light of all of the factors discussed herein, we are persuaded that the defense had a meaningful opportunity to review the court's proposed charge, at least for the limited purpose of determining whether it included an instruction concerning the fallibility of eyewitness identification evidence.

[8] The defense argued that Newson's testimony was not credible and that he had "an interest" in corroborating the version of events related by his neighbor, Ziebell.